**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY SYDNOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 11 C 2380 |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion for summary judgment [15], filed by Plaintiff Larry Sydnor, seeking judicial review of a decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration, denying Sydnor's application for disability insurance benefits ("DIB"). Plaintiff asks the Court to reverse the decision of the Administrative Law Judge denying him benefits or, alternatively, remand for further proceedings. Defendant filed a memorandum in support of the Commissioner's decision. For the following reasons, the Court grants Plaintiff's motion for summary judgment [15] and remands this matter for further proceedings consistent with this opinion.

**I.      Procedural Background**

On February 20, 2007, Plaintiff applied for disability insurance benefits without the assistance of counsel, alleging an onset date of September 15, 2004.[1] See Administrative Record

---

[1]  Once he retained counsel, Plaintiff's counsel expressed a willingness to amend Plaintiff's onset to a later date, so long as it was prior to December 2007, when his insured status expired.

("R") at 138.[2]   Plaintiff's application was denied both initially and upon reconsideration. Plaintiff timely requested a hearing.  On April July 29, 2009, Plaintiff, his attorney, his wife, a medical expert, and a vocational expert appeared and testified at a hearing before an Administrative Law Judge ("ALJ").  R. at 24.  In a decision dated November 16, 2009, the ALJ denied Plaintiff's application and made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 15, 2004 through his date last insured of March 31, 2008 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: diabetes mellitus, history of coronary artery disease (CAD)/cardiomyopathy, degenerative disc disease/degenerative joint disease of the lumbar spine, and osteoarthritis of the hands ((20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work, frequent fingering and handling objects, no climbing ladders, ropes, or scaffolds, and occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling.  The claimant must avoid all exposure to heights and moving machinery.

---

[2]  Unless otherwise indicated, all references in Sections I and II refer to the administrative record in this matter.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a security guard.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from September 15, 2004, the alleged onset date, through March 31, 2008, the date last insured (20 CFR 404.1520(f) and 404.1520(g)).

R. at 16-22.

Plaintiff sought review of the ALJ's decision and the Appeals Council denied his request, leaving the ALJ's decision as the final decision of the Commissioner.  Plaintiff now seeks judicial review of the final decision of the Commissioner of Social Security.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**II.     Facts**

**A.     Background**

Plaintiff, born on April 10, 1955, was fifty-two years old at the time that he applied for DIB.  R. at 387.  Mr. Sydnor has a long work history. For approximately 25 years, Mr. Sydnor was a warehouse clerk at a cleaning company, rising to the level of working supervisor.  Mr. Sydnor was last employed in September of 2004 by Continental Security at an assisted living home.  His responsibilities included helping the residents with their packages, making sure they got to their cars safely, and patrolling the grounds.  Mr. Sydnor earned slightly under $8,685.00 in 2004.

**B.     Medical Evidence**

The medical evidence in this case documents longstanding diabetes with neuropathy and cardiac problems and other problems such as arthritis, lumbosacral spine problems, knee pain,

elbow pain, hand pain, muscle atrophy, and depression. Beginning in October 2004, Dr. Kaihua Lai diagnosed Plaintiff with acute epididymitis, type-I diabetes, hyperlipidemia, and diabetic nephropathy. R. at 398. Plaintiff was prescribed Cipro. In January 2005, Sydnor reported pain to the left elbow area when doing pushups and heavy weight lifting. R. at 395-96. Then, in August 2005, Sydnor's physical exam revealed slight tachycardia and premature atrial contractions but was otherwise normal. R. at 382.

With respect to Mr. Sydnor's diabetes and neuropathy, the medical records indicate that he has been a diabetic since 1998. R. at 424. The medical records document that beginning in 2005, Mr. Sydnor struggled with high levels of glucose, hemoglobin, trigylcerides, and cholesterol. R. at 418, 420, 421. In February 2006, Plaintiff reported to Dr. Lai that he was working as a babysitter and "feeling well except for the low back pain." R. at 377. Dr. Lai noted that Mr. Sydnor suffered from low back pain and spasms and made an assessment of diabetic neuropathy. R. at 599, 601. The physical examination showed mild tenderness to the left side paraspinal muscle area, but otherwise was normal. R. at 377. Later that month, Plaintiff presented to the emergency room, where he was diagnosed with pneumonia with pleural effusion on the left side, non-insulin dependent diabetes mellitus, reactive airway disease, hypertension, and mild anemia. R. at 255. He also had a cough, fever, and hypotension from sepsis. R. at 255. Mr. Sydnor's sepsis was treated with both chest tubes and aggressive antibiotic treatment in the intensive care unit. R. at 255.

In March 2006, Plaintiff saw Dr. Lai for a follow-up for his pneumonia. R. at 374. Dr. Lai recommended a chest x-ray and that Plaintiff follow-up with Dr. Arnold Bolisay for his diabetes. R. at 374. She also stressed diet and exercise. R. at 374. Later that month, Plaintiff saw Dr. Robert Markus and complained of left-sided mid-back pain. R. at 371. Dr. Markus

noted some atelectasis in the left lower lung and elevation of the left hemidiaphragm. R. at 371. He recommended that Plaintiff follow-up with his primary care physician. R. at 371.

In May 2006, Plaintiff saw Dr. Bolisay for a recheck of his diabetes. R. at 368. He was diagnosed with Type II diabetes uncontrolled with non-compliance, hypertension controlled with medication, and hyperlipidemia on Lipitor daily. R. at 368. In August 2006, Dr. Bolisay noted that Plaintiff recently started exercising. R. at 365. Then, in December of 2006, Dr. Bolisay indicated in his notes that "Mr. Sydnor complains of bilateral hand weakness to the point where he can't open a jar." R. at 582. In January 2007, Plaintiff's physical examination was normal. R. at 361. Plaintiff's Glucophage dosage was increased. R. at 361.

On June 6, 2007, the Administration's consulting physician, Dr. Stanley Rabinowitz, examined Mr. Syndor and completed a Disability Examination Report. R. at 423-27. Dr. Rabinowitz found that range of motion testing in all the joints and spine was normal, except for the lumbar spine. R. at 426. Straight-leg raising was negative. R. at 426. Plaintiff had mild interossei atrophy of the thumb area and moderate difficulty squatting, but otherwise Dr. Rabinowitz's concluded that the examination of the extremities was normal. R. at 426. Plaintiff had decreased pinprick and light touch in a stocking distribution and reflex testing revealed absent ankle reflexes. R. at 426. Plaintiff had full motor strength in both the upper and lower extremities, there was no evidence of atrophy, and his gait was intact. R. at 426. Plaintiff was diagnosed with history of spontaneous pneumothorax, status post chest tube insertion with resolution; type II adult onset insulin dependent diabetes mellitus, poorly controlled on therapy with peripheral neuropathy and microscopic albuminuria secondary to nephropathy; and probable degenerative joint disease. R. at 427.

5

In addition to diabetic neuropathy, medical records confirm that Sydnor suffered from degenerative joint disease, which causes pain to his foot, knee, arm, and elbow.  R. at 424, 427, 444, 491, 492, 543.  In August 2007, Dr. Lai's progress notes reflect that Syndor presented with left upper arm pain and right knee pain for more than six months with no improvement.  R. at 444.  Dr. Lai ordered a radiology exam, which revealed early degenerative changes involving the left elbow, including a small spur.  R. at 492.  Dr. Lai also noted loose bodies within the right knee joint space and possible joint effusion.  R. at 446, 492.  On exam, Plaintiff had muscle tenderness over the triceps and slight tenderness over medial superior distal femur area.  R. at 444.  The cardiopulmonary exam was normal, Plaintiff had normal range of motion in the elbow joint and shoulder joints, muscle strength was normal, and right knee range of motion was normal.  R. at 444.  Plaintiff was diagnosed with left triceps tendonitis and right knee contusion with sprain.  R. at 444.  He was started on Motrin and advised to do three weeks of physical therapy.  R. at 444.

On September 20, 2007, Dr. Lai noted that Mr. Sydnor was experiencing left elbow pain, left shoulder pain, several months of right thumb pain, and right knee pain with ambulation.  He reported that his pain decreased with physical therapy, but complained of an onset of neck pain.  R. at 442.  He also reported right thumb pain after jamming his right thumb.  Tr. 442.  X-rays showed arthritis of the knee.  R. at 442.  He was diagnosed with right knee sprain, left elbow sprain, and left trapezius sprain.  R. at 442.

In November 2007, state agency physician Dr. Charles Kenney provided a residual functional capacity assessment.  R. at 456-63.  Dr. Kenney found that Plaintiff could lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; stand or walk for six hours; sit

six hours; frequently balance; and occasionally climb, stoop, kneel, crouch, and crawl.  R. at 457-58.

On November 20, 2007, Mr. Sydnor reported symptoms of sub-sternal chest discomfort for the past several months to his treating physician, Dr. Arnold G. Bolisay.  R. at 654.  On November 23, 2007, following an abnormal EKG, Dr. Bolisay ordered a series of cardiac tests. R. at 489.  Stress testing was done on December 4, 2007, and the results of the testing were characterized by treating physician Dr. Kaihua Lai as "quite abnormal."  R. at 558.  Similarly, Cardiologist Dr. Yogesh Tejpal characterized the stress test findings as "markedly abnormal."  R. at 557, R. at 658-659.   He also noted that Plaintiff's stress test showed a moderate sized reversible apical defect and that Plaintiff's overall ventricular systolic function was diminished at 23%.  R. at 557.  Dr. Tejpal indicated that Mr. Sydnor had multiple cardiac risk factors including diabetes, hypercholesterolemia, and hypertension, as well as a strong family history for cardiac arrest.  R. at 557.  As a result of the previous markedly abnormal stress results, Dr. Tejpal recommended that Mr. Sydnor undergo cardiac angiography.  R. at 557.  In January 2008, Nancy Melde, a certified nurse practitioner, noted that Plaintiff's angiogram revealed "essentially normal coronary arteries."  R. at 552.  She also noted that Plaintiff had a small plaque buildup in his left anterior descending artery.  R at 552.  Plaintiff stated he had been "doing well."  R. at 552.  In January of 2008, medical records reflect that Mr. Sydnor was prescribed Coreg for the cardiomyopathy.  R. at 552.  Plaintiff was diagnosed with nonobstructive coronary artery disease. [3]  R. at 551.

---

[3]    Mr. Sydnor was to have additional coronary testing later in 2008 to assess the ongoing cardiomyopathy, but he lost his medical coverage.  Mr. Sydnor had been insured through his wife's employer, however, in 2008 she lost her job and the family could no longer afford the insurance or ongoing treatment for Mr. Sydnor from his regular physicians at the Pronger Smith Medical Center.  R. at

In late 2007 and early 2008, Plaintiff's medical records also reflect ongoing thumb pain. A visit to Dr. Lai on November 6, 2007 documents a left ulnar neuropathy believed to be related to the diabetes along with right thumb weakness with muscle atrophy. R. at 656. Pain in both thumbs was noted on December 6, 2007, and was reported as having been present for the past five months. R. at 543. The pain was rated at a level 9 when using the hands. R. at 543. In early December of 2007, Dr. Lai suspected peripheral neuropathy and specifically noted that there was weakness and muscle atrophy between the thumb and index finger of the right hand. R. at 558. Also at that time, pain as well as tingling, numbness, and weakness were noted in the left hand. R. at 543. Despite the use of thumb splints, there was no reported improvement. R. at 543. On January 8, 2008, chart notes reflect bilateral arm neuropathy, and Mr. Syndor was referred for an EMG. R. at 554. On January 11, 2008, Dr. Joseph Mayer performed an electromyography on Mr. Sydnor's left upper extremity. Dr. Mayer indicated that there was evidence of a left ulnar neuropathy at that elbow that appeared mild to moderate in severity. R. at 482. In February 2008, a chart note from treating physician Dr. Lai described the neuropathy as "ulnar neuropathy." R. at 547. By late February of 2008, Sydnor described the pain in the left shoulder as shooting into the left hand. R. at 543.

Possibly as a result of Plaintiff's declining health, he began to show signs of depression, as indicated in Dr. Lai's progress notes in December of 2007. R. at 488. On December 3, 2007, a Whooley Depression Screening was administered, in which Sydnor stated that he recently felt "down, depressed or hopeless" and had "little interest or pleasure in doing things." R. at 488.

---

35-37, 48. Ultimately, Mr. Syndor was seen for his diabetes at the Oak Forest emergency room in June and August of 2008 (R. at 629-47) and later, in the fall 2008, Mr. Sydnor received treatment at a clinic for low income individuals (R. at 614-628).

Dr. Lai prescribed Prozac and encouraged Sydnor to see a psychologist. R. at 558. The December 10, 2007 chart notes of Dr. Tejpal also record depression and generalized fatigue. R. at 556, 658-59. Medical evidence also documents Sydnor's impotence, a typical side effect of depression, as early as October of 2004 (R. at 471) and April of 2005 (R. at 607).

In her July 22, 2009 statement, Mrs. Snydor described her husband's depression as well as his impotence and the profound impact of his conditions. R. at 611. Mrs. Sydnor indicated that Mr. Sydnor used to be active, hard working, and athletic. However, since he was diagnosed with diabetes, his body had been deteriorating. R. at 611. The statement further indicated that Mr. Snydor had pneumonia, lost his night vision, gets tingling in his legs, and gets cramps often, which affects his ability to sit for lengthy periods of time. Mrs. Sydnor specifically indicated in her statement that due to her husband's myriad health problem, he consequently has "bouts with depression." R. at 611. The statement also indicated that he could no longer do daily chores because he gets tired so quickly.

### C.     The Hearing on July 29, 2009

At the hearing conducted before the ALJ on July 29, 2009, Sydnor recounted his many medical issues as well as his depression. With respect to his diabetic neuropathy and degenerative joint disease, Sydnor made the following statement: "My arms, the arthritis in my hands, my thumb. I have no support where I can pick up. The thumbs give out. I can't do nothing there. I have problems in my back, my knees, my feet. My legs swell up. My ankle's weak * * * * I get a lot tireder [sic] quicker. And lately I have been having pains in the elbows where I can't put pressure, I can't push my body up. These problems have been going on for a good seven years. It's been getting worse as I go." R. at 34-35. Sydnor testified that in December 2006, he experienced bilateral hand weakness to the extent that at times he could not open a jar

and that he needed his wife's assistance.  R. at 37.  He further testified that in 2007, he was given thumb splints but they did not bring him any relief and the pain worsened when he tried to use his hands.  R. at 38.  Sydnor described the limits his pain places on him when he stated the following:  "I get up, I try to take a walk.  The walk lasts a little long sometimes because I get tired.  Then, when I come back, I basically stay around the house most of the day * * * * I try to do some things, but there's not too much I can do, because I get tired, or my hands bother me."  R. at 40.  He testified that due to the pain in his legs, he has a hard time sleeping.  R. at 40.  With respect to his cardiac problems, Sydnor testified that the doctors explained that he was at risk for congestive heart failure.  R. at 39.  He also testified that he was reluctant to take Prozac because he was already on too many medications.  R. at 42.  He further testified that he suffered from erectile dysfunction and that this situation contributed to his depression.  R. at 42.

Mrs. Sydnor also testified at the hearing.  She stated that over the years she has seen Mr. Sydnor become "very frustrated with his body and the fact that it just doesn't function.  R. at 47. She summed up her husband's declining health:  "you know, as a man, as the breadwinner, just the whole gamut * * * your body's giving out, and what can you do? You just take it day by day."  R. at 47.

Dr. Hugh Savage, a cardiologist, testified as a medical expert.  R. at 50.  Dr. Savage testified that Plaintiff had a history of left ventricular dysfunction, which was of moderate severity in December 2007.  R. at 55.  He stated that Plaintiff was started on Coreg to strengthen the left ventricular, and he believed that the medication would improve the heart muscle.  R. at 55.  However, there is no objective medical evidence in the record which documents Dr. Savage's prediction.  Dr. Savage also discussed Plaintiff's cardiac issues.  He noted that the ejection fraction in December 2007 was 35% from the ECG, but 25% in the stress test scan.  R.

at 55. He then spent considerable time testifying why it was important to understand which number was more likely indicative of Plaintiff's cardiac problems. The stress test showed Plaintiff was in functional class 1, which meant "essentially no limitations." R. at 56. Dr. Savage explained that there are four different classes, with 1 meaning a person is not limited cardiac-wise. Dr. Savage noted that Plaintiff was able to exercise 9.9 metabolic equivalents (METS), which substantiated that Plaintiff was functional class 1. Furthermore, Dr. Savage pointed out that the records indicated only minimal coronary disease. R. at 56. Dr. Savage concluded that the ejection fraction of 35% was corroborated by Plaintiff's functional classification 1, whereas the 25% was not compatible with having a functional class l. R. at 56-57. Dr. Savage did not discuss Plaintiff's treating physician's opinions that the stress test results were markedly "abnormal."

Dr. Savage opined that light work was appropriate, and that Plaintiff's cardiac function improved so that he would be at "strong light, and, even possibly, a medium [exertional level], after that treatment course in which the left ventricular dysfunction was satisfactorily treated. R. at 57-68. Dr. Savage noted there was no real mention of exertional dyspnea in the treatment notes. R. at 58. Regarding joint discomfort, Dr. Savage cited the June 2007 consultative examination findings showed normal grip, 5/5 motor strength throughout, and negative straight leg raise. R. at 58-59. Dr. Savage concluded that there were no limitations in handling or fingering. R. at 59. There were no ongoing complaints of musculoskeletal pains, except for pain in both thumbs that Plaintiff claimed had been present for five months. R. at 59. Dr. Savage opined that the thumb pain did not appear to be much of an issue after Sydnor began taking Ibuprofen. R. at 59-60. Dr. Savage noted that at the January 31, 2008 examination, there was no mention of the musculoskeletal system or related problems and the exam was essentially

negative. R. at 60. Dr. Savage felt that Plaintiff's condition worsened later in 2008 after he lost insurance in March or April 2008. R. at 60-61. Dr. Savage explained that he did not believe peripheral neuropathy was a limiting factor because it was not constantly referred to by Plaintiff or his treaters. R. at 63.

A vocational expert (VE) also testified. The ALJ asked the VE to consider an individual of Plaintiff's age, education, and work experience, who had the following residual functional capacity (RFC): he would be limited to light work; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and he should avoid unprotected heights and moving machinery. R. at 78. The VE testified that such a person could perform Plaintiff's past relevant work as a security guard. R. at 79. The VE testified that such an individual could also perform the following occupations in the economy: light warehouse guard (3,000 in Chicago regional area), light caterer helper (2,500 jobs), sedentary security clerk (3,500 jobs), and information clerk (2,500 jobs). R. at 79. The VE testified that if the hypothetical included frequent repetitive handling or fingering, his testimony would not change. R. at 80.

## III.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. See *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v.*

*Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. See *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and were made under the correct legal standard. See *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. See *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); see also

13

*Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**IV.     Disability Standard**

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The steps are:  (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if so, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other

work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); see also *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; see also *Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## V.    Analysis

Plaintiff argues that the ALJ committed reversible error by (i) finding that Plaintiff retained the ability to perform full-time competitive work with a RFC for light work; (ii) finding that Plaintiff was not credible as to his statements regarding the intensity, persistence and limiting effects of his symptoms; and (iii) failing to properly consider all exertional as well as non-exertional impairments. The Court considers each argument in turn.

### A.    Ability to Perform Light Work

Plaintiff first challenges the ALJ's finding that he could perform a reduced range of light work. As pointed out by the ALJ in her decision, the RFC finding is supported by (i) the testimony of Dr. Savage, the medical expert who testified at the hearing that light work was appropriate, (ii) the report of Charles Kenney, M.D., the state agency consultant who indicated that Plaintiff could perform light work, and (iii) the testimony Grace Gianforte, a vocational

expert who testified at the hearing. Dr. Savage testified that Plaintiff's cardiac function improved so that he would be at "strong light, and, even possibly, a medium [exertional level], after that treatment course in which the left ventricular dysfunction was satisfactorily treated" (R. at 58). Dr. Savage also concluded that there were no limitations in handling or fingering (R. at 59). The ALJ's RFC finding also was supported by Dr. Kenney's opinion that Plaintiff could lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally; stand/walk six hours; sit six hours; frequently balance; and occasionally climb, stoop, kneel, crouch, and crawl (R. at 457-58).

Plaintiff contends that the ALJ erred in relying on Dr. Kenney's opinion because Dr. Kenney only reviewed evidence through mid-September 2007. Indeed, Dr. Kenney did not review the medical records related to Plaintiff's various stress tests and significant cardiac developments, information which would have been pertinent to his opinion, because he issued his report prior to these developments and did not supplement his report once the cardiac issues were identified. Because these additional cardiac developments bear on whether Plaintiff could perform light work, the Court concludes that it was error for the ALJ to give "significant weight" to Kenney's opinion when the report failed to consider any of the significant cardiac developments which emerged in the fall and winter of 2007 and 2008.

Even more problematic with the ALJ's opinion with respect to Plaintiff's ability to perform light work is her failure to discuss how his documented medical impairments—a long history of medical issues including diabetes and diabetic neuropathy, as well as more recent issues such as arthritis, cardiomyopathy, and depression—affect his ability to perform light work. In reaching the conclusion that Plaintiff was capable of performing light work, the ALJ relied on the opinion of the medical expert who testified at the hearing, while affording little to

no weight to the opinions of Plaintiff's treating doctors. In Paragraph 3 (see R. at 16-18), the ALJ lists Plaintiff's medical impairments, but in analyzing whether he can perform light work in Paragraph 4 (R. at 18-20), she makes no mention of any of the medical records from his treating physicians, many of which support Plaintiff's own allegations.  Although she goes through Plaintiff's testimony, but she never once mentions the medical records that support his testimony.  Instead, she relies exclusively on Dr. Savage's testimony in determining that Plaintiff was capable of performing light work.

For instance, both Dr. Savage's and the ALJ's treatment of the stress test were suspect. On November 23, 2007, following an abnormal EKG, Dr. Bolisay ordered a Thallium Treadmill Stress Test (T-490). This test was performed on December 4, 2007 and later that day a Stress Thallium Report was issued (R. at 486). The provisional and initial Stress Thallium Report was considered to be "equivocal" or uncertain and open to interpretation. The report nevertheless indicated it was stopped due to Plaintiff's fatigue.  The report further stated that the nuclear images of the test would be reported separately. These were reported on the following day and thus, on December 5, 2007, the Exercise Myocardial Perfusion Scan, which is the nuclear aspect of the Thallium Treadmill Stress Test, revealed a different story. The findings showed that while at rest the perfusion was uniform, the left ventricle was indeed substantially hypokinetic post stress with an ejection fraction measured at 23%.  Plaintiff's treating physician, Dr. Lai, characterized the stress test as "quite abnormal" (R. at 558). The treating cardiologist, Dr. Tejpal, characterized the stress test findings as "markedly abnormal" (T-557, T-658-659).

At the hearing, Dr. Savage, questioned whether the 23% was accurate while neglecting to mention both Dr. Lai's and Dr. Tejpal's interpretations and concerns about the testing which was

done.[4]  Dr. Savage did not even minimally discuss the 25% angiogram ejection fraction figure, and instead only focused on the fact that the catheterization did not reveal significant coronary artery disease, or specifically a lesion in the artery requiring surgery.  But the bigger issue is that the ALJ's decision failed to mention or discuss what weight she gave Dr. Tejpal's and Dr. Lai's opinions that the stress test findings were significantly abnormal.  Once again, because these cardiac developments bear on Plaintiff's ability to perform light work, the ALJ's decision is deficient for failing to evaluate or explain the weight accorded to these opinions regarding the stress test.[5]  See 20 C.F.R. §404.1527.  Dr. Tejpal's opinion of Mr. Sydnor's stress test constitutes an opinion under the regulations and should have been considered by the ALJ.

Furthermore, no evidence was presented that the regimen of Coreg which was prescribed to strengthen the heart and improve the ejection fraction actually has done so. Dr. Savage asserted he suspected that the ejection fraction was indeed improved from Mr. Sydnor's taking of Coreg. But this could only be assessed with a repeated echocardiagram or other diagnostic testing, and, as pointed out previously, Mr. Sydnor lost his insurance coverage and became

---

[4]  The Commissioner has not contested Plaintiff's assertion that normal ejection fractions are 50% to 65%.

[5]  The Commissioner argues that statements regarding whether a stress test is normal or abnormal are not the type of "opinions" governed by the treating source rule (Defendant's Brief at 14). In support of this argument the Commissioner refers to 20 C.F.R. §404.1527 (a)(2) which states that "Medical opinions are statement from physicians * * * that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you still do despite impairment(s), and your physical or mental restrictions."  Contrary to the Commissioner's argument, it seems logical that a doctor's characterization of a medical test constitutes an opinion under the regulations.  Medical tests are a tool to help doctors form a comprehensive diagnosis. Differing opinions of medical test results can lead to quite different conclusions regarding an individual's diagnosis and plan of treatment.  In this case, Dr. Tejpal specifically stated in his chart notes under "Impression / Plan" that Plaintiff presented with "multiple cardiac risks factors including a strong family history, hypercholesterolemia, diabetes, and hypertension" and "a markedly abnormal stress test" (R. at 659). The chart notes further state that since Plaintiff "has such a markedly abnormal evidence on Cardiolite stress test, we will check a 2D echocardiogram to evaluate his overall left ventricular function" (R. at 557, 659).

unable to afford this further testing.  Additionally, Dr. Savage's testimony did not consider the fact that Mr. Sydnor reported to Dr. Lai that with an increased dosage of Coreg he was experiencing "increasing fatigue" (R. at 547), a known common side effect of Coreg.  Both Dr. Savage and the ALJ fail to explain how someone with significant fatigue from a prescribed medication regimen could be expected to perform the demands of competitive full time work at a light exertional level.  The ALJ's failure to minimally consider the side effects of this medication further calls into question the ALJ's residual functional capacity findings.

Light work however requires an individual to be able to perform work which requires standing and walking up to 6 hours in a workday.  With respect to the use of the hands, a worker must be able to grasp, hold, and turn objects and lift frequently 10 pounds up to two-thirds of the day and up to 20 pounds occasionally. Both Mr. and Mrs. Sydnor testified to multiple symptoms and limitations which would be incompatible with the demands of light work.  In the face of conflicting evidence from the state agency physicians and the Sydnors, at a minimum the ALJ should have discussed Plaintiff's documented medical impairments in assessing his ability to do light work and yet she failed to do so; instead, she placed "significant weight" on Dr. Kenney's November 2007 report, which failed to consider subsequent, significant, documente developments.   Because of these errors, the Court concludes that the ALJ's decision was not supported by substantial evidence.

### B.    Claimant's Credibility

Plaintiff also argues that the ALJ's credibility determination was faulty and that the ALJ merely stated her opinion that Plaintiff's statements concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms were not fully credible.  Although the ALJ's credibility

determination was not as "boilerplate" as some, the ALJ's assessment of Plaintiff's credibility has some troubling holes. See also *McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010) (finding that a credibility determination that stated "based on the evidence, the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the claimant's statements concerning the intensity, persistence, and liming effects of these symptoms are not entirely credible" followed by a dissection of the claimant's testimony, was reversible error).

Here, the ALJ failed to address in any meaningful way why she found Plaintiff's testimony not to be credible. *Id*. Contrary to some decisions which have been found to be lacking, the ALJ did cite some facts to support her decision. Specifically, the ALJ mentioned (1) Plaintiff's daily activities; (2) his noncompliance with medications on three occasions, one of which was due to his not being able to afford the medication; and (3) the fact that he did not have a medical reason for leaving his last job but rather was "let go." The problem with the decision is that she does not set forth how these facts shaped her assessment of Plaintiff's credibility. She merely states that she does not find him credible because these facts exist. Yet it is not evident from the face of these facts that Plaintiff's credibility was suspect. Rather, the fact that (i) Plaintiff's daily activities have been sharply curbed, (ii) at times he cannot afford his medicine, and (iii) he lost his last job could just as easily support a favorable decision as an unfavorable one.

With respect to noncompliance with medication, the Court is able to piece together the ALJ's reasoning. However, the Seventh Circuit has made clear that while infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, the ALJ "must not draw any inferences" about a claimant's condition from this failure without exploring the

claimant's reasons. SSR 96-7p; see also *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *McClesky v. Astrue*, 606 F.3d 351, 352 (2010) (noting that the ALJ erred in basing an adverse credibility finding on Plaintiff's refusal to take certain drugs because the ALJ failed to consider they were "powerful and expensive drugs that many people are reluctant to take"); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected."). During the hearing, however, the ALJ did not question the Plaintiff about either his lack of medical treatment or his noncompliance with medications noted in the record. Nor does she appear to have followed up with Plaintiff regarding his inability to afford certain medications. Ultimately, these omissions are detrimental to the Court's ability to assess the ALJ's credibility determination.

The ALJ first stated a conclusion that she did not find Plaintiff's testimony convincing, and then highlighted certain facts to apparently support her decision. The problem is that the Court cannot glean from her decision how these facts actually support her decision that Plaintiff was not credible, rather than supporting Plaintiff's testimony that he is disabled and cannot perform light work. In *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003), the Seventh Circuit rejected the Commissioner's argument that the ALJ's reasoning could be implied. *Id.* at 916 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (July 2, 1996)); see also *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (finding problematic the ALJ's "fail(ure) to indicate which statements were not credible and what exactly 'not entirely' is meant to signify."); *Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011); *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010). Here, the ALJ's reasoning for why she decided Plaintiff was not

credible is simply not apparent. For instance, the ALJ noted that Plaintiff testified that he stopped working in September 2004 because he "was let go" (R. at 20, 32-34). In fact, Plaintiff reported that he had been laid off (R. at 173). While the ALJ's opinion notes this fact, it does not discuss what bearing this fact had on her decision. How does Plaintiff's lay off in 2004 bear on his ability to perform light work several years later? Furthermore, in looking at Plaintiff's daily activities, it is apparent that Plaintiff's daily activities have been substantially curtailed since 2004-05. Yet the ALJ's decision does not account for the disparity, but rather merely lists some of his daily activities, without going into the frequency or duration of those activities as compared to the frequency and duration with which he used to perform those activities. The ALJ also found that Plaintiff's treatment had been "routine and conservative" (R. at 20). See 20 C.F.R. § 404.1529(c)(3)(v) (treatment considered in assessing credibility). Again, she notes her opinion regarding the treatment, but does not discuss how this affected her credibility determination.

Ultimately, the ALJ appeared to reject Plaintiff's testimony because it was subjective evidence. But the Seventh Circuit has found that "once the claimant produces medical evidence of an underlying impairment," which Plaintiff undoubtedly did, "the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (internal quotation omitted); see also 20 C.F.R. § 404.1529(a). Here, the ALJ's analysis failed to show that she even considered the objective medical evidence in evaluating Plaintiff's testimony. Accordingly, the ALJ's credibility determination was legally inadequate.

### C. Non-exertional Impairments

Plaintiff's final argument is that the ALJ's decision failed to properly factor in all of Mr. Sydnor's exertional and nonexertional impairments as well as the combined effect of all of his impairments. SSR 96-8p requires an ALJ to consider the effect of both severe and non-severe impairments on a claimant's ability to perform past work or other work. According to Plaintiff, regardless of whether they are deemed severe impairments, the ALJ was still required to consider the effects of Plaintiff's depression, peripheral neuropathy, and knee pain, in combination with his other impairments. In turn, the Commissioner responds that the "only medical evidence Plaintiff appears to cite is Dr. Lai's December 2007 progress note, in which Plaintiff complained of being depressed 'lately' (R. at 558), and Dr. Tejpal's chart notes from the same month that reflect a past history of depression (R. at 556)." The Commissioner then argues that this "scant evidence of depression fails to establish that Plaintiff had depression that imposed any limitations or that he even had depression for longer than the month of December 2007."

The ALJ's decision plainly shows that she failed to consider Mr. Sydnor's depression at all, let alone as an impairment or severe impairment. There is evidence in this case of a mental impairment, which was documented by Mr. Sydnor's doctors in late 2007. Additionally, Mr. Sydnor's testimony about his depression was supported by his wife's written statement and testimony. Mrs. Sydnor described in her written statement her husband's depression as well as his impotence and the profound impact this condition has had with the unsuccessful attempts to deal with it using medication. None of this evidence is even minimally addressed in the ALJ's decision. The ALJ also failed to assess the credibility of Mrs. Sydnor's testimony as it relates to the severity of Plaintiff's symptoms. Mrs. Sydnor reported that Mr. Sydnor could not sit for extended periods as his legs give him problems. She reported fatigue so severe that doing chores became very difficult. Her testimony was consistent with Mr. Sydnor's testimony as to

numerous problems associated with diabetes and neuropathy including weakness and pain in the hands, elbows, back and knees, fatigue, excessive sweating, and difficulty sleeping.

In the calculus of what a claimant can do in the workplace, "the totality of a claimant's limitations" must be considered. This requires the inclusion of limitations associated with "deficiencies of concentration, persistence and pace." See *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Mr. Sydnor's depression and the impact that this condition would have on concentration, persistence, and pace were not adequately considered by the ALJ. The omission is significant given the fact that Vocational Expert Grace Gianforte testified that if an individual would be periodically off task for up to two hours of an eight-hour workday, he or she would not be able to sustain substantial gainful activity. Also, absence from work two to three times per month would be in excess of what is tolerated by employers in both the private and public sector. Both Plaintiff and his wife testified to periods of time where there would be pain, fatigue, numbness, and depression. It is not clear from the ALJ's decision what weight, if any, she gave to this testimony.

The Social Security Act requires the ALJ "to consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 USC § 423(d). Given the testimony from the Sydnors along with the evidence in the record that Plaintiff suffered from depression, the ALJ should have followed the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a. The regulations require the ALJ to use the "special technique" for evaluating mental impairments. 20 C.F.R. § 404.1520a-(a). The regulations require the ALJ to rate the degree of functional loss resulting from the mental impairment in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation. See 20 C.F.R. § 404.1520a(c)(3). These areas are rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform those work-related functions. See 20 C.F.R. § 404.1520a. While the ALJ is no longer required to complete the PRTF, she must "document application of the technique in the decision." See 20 C.F.R. §404.1520a(e)(2).

No such analysis was done in this matter despite the fact that the medical evidence documents depression, sleep problems, and impotence. The fact that the origins of Mr. Sydnor's problems with depression may be related to his multiple physical problems does not excuse the ALJ from the requirement to analyze the impact of depression in this matter. The depression alone constitutes a non-exertional impairment and at a minimum the ALJ needed to ascertain the impact of Mr. Sydnor's depression on his ability to sustain concentration, persistence, and pace in the workplace. This was never done and represents a significant omission in the ALJ's analysis.

### D.      Remedy

Plaintiff argues that reversal and an award of benefits is the proper remedy. In the alternative, he asks that the matter be remanded for rehearing before a different ALJ. Ordinarily, when an ALJ errs, the appropriate remedy is to remand for further proceedings. *Windus*, 354 F. Supp. 2d. at 951. The Court will award benefits only if all "essential factual issues have been resolved and the record overwhelmingly supports a finding of disability." *Id*.

In this case, the proper remedy is remand. The record at this time does not overwhelmingly support a finding of disability—the primary reason for reversal is the ALJ's failure to properly consider evidence and testimony and to provide sufficient explanation for her findings.

## VI.      Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment [15] and remands this matter to the Social Security Administration for further proceedings consistent with this opinion.


Dated:  August 13, 2012

_____
Robert M. Dow, Jr.
United States District Judge